2010-01095
FILED
April 28, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002593029

JEFFER, MANGELS, BUTLER & MARMARO LLP
ROBERT B. KAPLAN (Bar No. 76950)
WALTER W. GOULDSBURY III (Bar No. 240230)
Two Embarcadero Center, Fifth Floor
San Francisco, California 94111-3813
Telephone: (415) 398-8080
Facsimile: (415) 398-5584

Attorneys for WELLS FARGO BANK, NATIONAL ASSOCIATION and WELLS FARGO EQUIPMENT FINANCE, INC.

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re<br><br>FRANK J. GOMES DAIRY,<br><br>    Debtor. | CASE NO. 09-61024-A-11<br><br>Chapter 11 |
| WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, and WELLS FARGO EQUIPMENT FINANCE, INC., a Minnesota corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>FRANK J. GOMES DAIRY, a California limited partnership; and JAMES D. McCUNE and RICHARD S. BONDAR, Trustees of the BM&A, Inc. Retirement Trust, dated 09/01/87,<br><br>    Defendants. | Adversary No.: |

**COMPLAINT FOR DECLARATORY RELIEF TO DETERMINE NATURE, SCOPE, EXTENT AND PRIORITY OF LIENS AND DETERMINATION OF SECURED STATUS AND TO DETERMINE ENFORCEABILITY OF 11 U.S.C. § 510(a)**

Plaintiffs Wells Fargo Bank, National Association, a national banking association ("Bank") and Wells Fargo Equipment Finance, Inc., a Minnesota corporation ("WFEF"), pursuant to

PRINTED ON RECYCLED PAPER
992984v1

- 1 -     COMPL FOR DECLARATORY RELIEF TO DETERMINE NATURE, SCOPE, EXTENT ETC.

11 U.S.C. § 506, 28 U.S.C. §§ 157 and 1334, and Rule 7001 of the Federal Rules of Bankruptcy Procedure, file this Complaint for Declaratory Relief to Determine Nature, Scope, Extent and Priority of Liens and Determination of Secured Status and to Determine Enforceability of 11 U.S.C. § 510(a) ("Complaint") against the defendant debtor Frank J. Gomes Dairy, a California limited liability partnership ("Debtor") and defendants James D. McCune and Richard S. Bondar, Trustees of the BM&A, Inc. Retirement Trust, dated 09/01/87 ("BMA Trust") as follows:

## PARTIES, JURISDICTION AND VENUE

1. The Debtor voluntarily filed its petition for relief under Chapter 11 of the Bankruptcy Code on November 12, 2009.

2. The Bank is a national banking association and secured creditor of the Debtor and WFEF is a Minnesota corporation and a secured creditor of the Debtor.

3. Bank and WFEF (the "Secured Creditors") are informed and believe and thereon allege that BMA is also a secured creditor of the Debtor.

4. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157 (b)(2)(K).

5. This is an adversary proceeding within the meaning of Rule 7001 of the Federal Rules of Bankruptcy Procedure to determine the nature, extent, priority and validity of the Secured Creditors' liens and the assets of the Debtor and to resolve various disputes which exist over the interpretation of an Intercreditor Agreement (as that term is hereinafter defined).

6. Venue properly lies in this jurisdiction pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

**The Bank's Perfected Security Interest**

7. Bank and Debtor entered into that certain letter agreement dated June 5, 2007 ("Letter Agreement") which outlined the terms and conditions to which Bank would extend credit to Debtor, a true and correct copy of which is attached hereto as <u>Exhibit 1</u> and incorporated herein by this reference as though set forth in full.

8. Bank and Debtor entered into that certain letter amendment dated June 20, 2008 ("Letter Amendment") whereby Bank and Debtor, <u>inter alia</u>, agreed to amend certain terms of

PRINTED ON RECYCLED PAPER

the Letter Agreement, a true and correct copy of which is attached hereto as <u>Exhibit 2</u> and incorporated herein by this reference as though set forth in full.

9. Debtor made, executed and delivered to Bank, for value received, that certain Term Note dated June 1, 2006 in the original principal amount of $4,000,000 ("Term Note No. 1"), having an original final payment maturity date of June 5, 2012, a true and correct copy of which is attached hereto as <u>Exhibit 3</u> and incorporated herein by this reference as though set forth in full.

10. Debtor made, executed and delivered to Bank, for value received, that certain Term Note dated June 23, 2005 in the principal sum of $9,500,000 ("Term Note No. 2"), having an original final payment maturity date of July 5, 2012, a true and correct copy of which is attached hereto as <u>Exhibit 4</u> and incorporated herein by this reference as though set forth in full. Term Note No. 1 and Term Note No. 2 shall hereinafter collectively be referred to as the "Term Notes".

11. In order to secure repayment of all obligations owed by Debtor to Bank pursuant to the Term Notes, Debtor, as trustor, executed and delivered to Bank that certain Deed of Trust and Assignment of Rents and Leases executed as of June 1, 2006 ("Deed of Trust") in favor of American Securities Company, as trustee, for the benefit of Bank, as beneficiary, with respect to the Rents and Parcels 1 thru 13 (as legally described in Exhibit A to the Deed of Trust) ("Real Property No. 1") located in Merced County and the Gomes Trustee No. 1, as trustor, executed the Deed of Trust in favor of American Securities Company, as trustee, for the benefit of Bank, as beneficiary, with respect to the Rents and Parcels 14 thru 16 (as legally described in Exhibit A to the Deed of Trust) ("Real Property No. 2" and together with Real Property No. 1, the "Subject Property") located in Merced County. The Deed of Trust was recorded on June 9, 2006 in the Official Records of the Merced County Recorder's Office, and a true and correct copy of the Deed of Trust is attached hereto as <u>Exhibit 5</u> and incorporated herein by this reference as though set forth in full.

12. Thereafter, Debtor and Bank executed that certain ISDA Master Agreement dated as of November 29, 2007 ("Master Agreement "), a true and correct copy of which is attached hereto as <u>Exhibit 6</u> and incorporated herein by this reference as though set forth in full.

13. In connection with entering into the Master Agreement, Debtor and Bank executed that certain Schedule to the ISDA Master Agreement dated as of November 29, 2007

("Schedule"), which supplemented the terms of the Master Agreement, a true and correct copy of which is attached hereto as <u>Exhibit 7</u> and incorporated herein by this reference as though set forth in full.

14. The Schedule governs each of (1) that certain Confirmation dated June 20, 2005 ("Confirmation No. 1") executed by Debtor and Bank evidencing an interest rate swap transaction with Trade ID 35415, Trade Date of June 17, 2005 and an initial Notional Amount of $9,500,000.00 (the "35415 Swap Transaction"), (2) that certain Confirmation dated May 31, 2006 ("Confirmation No. 2") executed by Debtor and Bank evidencing an interest rate swap transaction with Trade ID 91898, Trade Date of May 26, 2006 and an initial Notional Amount of $4,000,000.00 (the "91898 Swap Transaction"), and (3) that certain ISDA Confirmation dated December 13, 2007 ("Confirmation No. 3," together with the Master Agreement, the Schedule, Confirmation No. 1 and Confirmation No. 2, the "Swap Agreement") executed by Debtor and Bank evidencing an interest rate swap transaction with Trade ID 248780, Trade Date of November 29, 2007 and an initial Notional Amount of $4,000,000.00 (the "248780 Swap Transaction" and together with the 35415 Swap Transaction and the 91898 Swap Transaction, the "Swap Transactions" and individually a "Swap Transaction").

15. In connection with the execution of the Letter Amendment, Debtor made, executed and delivered to Bank, for value received, that certain Revolving Line of Credit Note dated June 20, 2008 in the original principal amount of $2,000,000 having a final payment maturity date of June 5, 2009 ("Revolving Note No. 1"), a true and correct copy of which is attached hereto as <u>Exhibit 8</u> and incorporated herein by this reference as though set forth in full.

16. In connection with the execution of the Letter Amendment, Debtor made, executed and delivered to Bank, for value received, that certain Revolving Line of Credit Note dated June 20, 2008 in the original principal amount of $4,000,000 having a final payment maturity date of June 5, 2009, a true and correct copy of which is attached hereto as <u>Exhibit 9</u> and incorporated herein by this reference as though set forth in full ("Revolving Note No. 2" and together with the Revolving Note No. 1, the "Revolving Notes").

17. To secure repayment of all obligations owed by Debtor to Bank pursuant to

the Letter Agreement, the Letter Amendment, the Swap Agreement, the Term Notes, and the Revolving Notes, Debtor executed in favor of Bank that certain Continuing Security Agreement-Rights to Payment and Inventory dated June 5, 2007 ("RTP Security Agreement") wherein Debtor granted a security interest to Bank in various items of collateral including, <u>inter alia</u>, all Rights to Payment, Inventory and Proceeds (as those terms are defined therein) to secure all present and future indebtedness of Debtor to Bank ("RTP Collateral"), a true and correct copy of which is attached hereto as <u>Exhibit 10</u> and incorporated herein by this reference as though set forth in full.

18.     In order to secure repayment of all obligations owed by Debtor to Bank pursuant to the Letter Agreement, the Letter Amendment, the Swap Agreement, the Term Notes, and the Revolving Notes, Debtor executed in favor of Bank that certain Security Agreement-Equipment dated June 5, 2007 ("Equipment Security Agreement") wherein Debtor granted a security interest to Bank in various items of collateral including, <u>inter alia</u>, all goods, tools, machinery, furnishings, furniture and other equipment now or thereafter owned by Debtor and all Proceeds (as that term is defined therein) thereof to secure all present and future indebtedness of Debtor to Bank ("Equipment Collateral"), a true and correct copy of which is attached hereto as <u>Exhibit 11</u> and incorporated herein by this reference as though set forth in full.

19.     In order to further secure repayment of all obligations owed by Debtor to Bank pursuant to the Letter Agreement, the Letter Amendment, the Swap Agreement, the Term Notes, and the Revolving Notes, Debtor executed in favor of Bank that certain Security Agreement-Livestock dated June 5, 2007 ("Livestock Security Agreement") wherein Debtor granted a security interest to Bank in various items of collateral including, <u>inter alia</u>, all farm products consisting of livestock and poultry, born or unborn, including aquatic goods produced in aquacultural operations, and all feed, medicines and other supplies used or produced in Debtor's farming operations now or thereafter owned by Debtor and all Proceeds (as that term is defined therein) thereof to secure all present and future indebtedness of Debtor to Bank ("Livestock Collateral"), a true and correct copy of which is attached hereto as <u>Exhibit 12</u> and incorporated herein by this reference as though set forth in full.

20.     In order to secure repayment of all obligations owed by Debtor to Bank

pursuant to the Letter Agreement, the Letter Amendment, the Swap Agreement, the Term Notes, and the Revolving Notes, Debtor executed in favor of Bank that certain Security Agreement-Crops dated June 5, 2007 ("Crops Security Agreement") wherein Debtor granted a security interest to Bank in various items of collateral including, inter alia, all farm products consisting of crops, including crops produced on trees, vines, and bushes and aquatic goods produced in aquacultural operations, and all supplies used or produced in Debtor's farming operations now or thereafter owned by Debtor and all Proceeds (as that term is defined therein) thereof to secure all present and future indebtedness of Debtor to Bank ("Crops Collateral"), a true and correct copy of which is attached hereto as Exhibit 13 and incorporated herein by this reference as though set forth in full.

21. In order to secure repayment of all obligations owed by Debtor to Bank pursuant to the Letter Agreement, the Letter Amendment, the Swap Agreement, the Term Notes, and the Revolving Notes, Debtor executed in favor of Bank that certain Assignment Production Base and Pool Quota dated June 23, 2005 ("Assignment") wherein Debtor granted, transferred, and assigned to Bank a security interest in all of Debtor's Production Base and Pool Quota as security for any and all Indebtedness (as those terms are defined therein), a true and correct copy of which is attached hereto as Exhibit 14 and incorporated herein by this reference as though set forth in full. The RTP Security Agreement, Equipment Security Agreement, Livestock Security Agreement, and the Crops Security Agreement are hereinafter collectively referred to as the "Security Agreements". The RTP Collateral, Equipment Collateral, Livestock Collateral, the Crops Collateral, and the Production Base and Pool Quota are hereinafter collectively referred to as the "Bank Collateral". The Letter Agreement, Letter Amendment, Term Notes, Revolving Notes, Deed of Trust, the Assignment, the Security Agreements, the Swap Agreement, and all documents and instruments executed in connection therewith are hereinafter collectively referred to as the "Secured Loan Documents". All capitalized terms not otherwise defined in this Complaint shall have the meanings ascribed to them in the Secured Loan Documents.

22. An Event of Default occurred under the Secured Loan Documents because of, inter alia, the failure of Debtor to pay to Bank all outstanding obligations due and owing pursuant to the Revolving Notes on the final payment maturity date thereof of June 5, 2009 (the

"Revolving Note Event of Default"). Subsequently, the Bank and the Debtor entered into that certain Forbearance Agreement and General Releases dated June 5, 2009 as thereafter amended dated September 5, 2009 pursuant to which the Bank agreed to forbear from exercising its rights and remedies pursuant to the Secured Loan Documents. The Debtor's filing of the above-entitled Chapter 11 case on November 12, 2009 also constituted an additional Event of Default under the Secured Loan Documents.

23. The Bank's security interest in the Bank Collateral was perfected by the filing of various UCC-1 financing statements in the California Secretary of State's Office, true and correct copies of which are attached as <u>Exhibit 15</u> and incorporated herein by this reference as though set forth in full.

24. The occurrence of the Revolving Note Event of Default also was a default under the Term Notes ("Term Note Event of Default") and a default and Early Termination Event under the Swap Agreement.

25. As a result of the occurrence of Term Note Event of Default, on June 9, 2009, the Bank accelerated all outstanding obligations owed by Debtor to Bank pursuant to the Term Notes.

26. On June 9, 2009, the Bank made written demand for payment on the Debtor of all outstanding obligations due and owing by the Debtor to the Bank pursuant to the Term Notes and the Revolving Notes. The Debtor failed to satisfy that demand for payment made by the Bank.

**WFEF's Perfected Security Interests**

27. On or about September 7, 2005, the Debtor and WFEF executed that certain Master Lease No. 152856 ("Master Lease"), a true and correct copy of which is attached hereto as <u>Exhibit 16</u>.

28. Pursuant to the Master Lease, the Debtor and WFEF executed eight Supplements to the Master Lease, Supplemental Nos. 0152856-400, 0152856-401, 0152856-402, 0152856-403, 0152856-404, 0152856-405, 0152856-406, and 0152856-407 at various times between September 7, 2005 and December 7, 2007 (collectively, the "Supplements to Master Lease"), pursuant to which WFEF leased the equipment described therein (collectively, the

"Equipment") to the Debtor, true and correct copies of which are attached collectively as Exhibit 17.

29. In order to secure repayment of all obligations owed by the Debtor to WFEF pursuant to the Master Lease and Supplements to Master Lease, the Debtor executed that certain Security Agreement dated as of September 7, 2005 in favor of WFEF and Amendment to Security Agreement dated as of September 7, 2005 (collectively, the "WFEF Security Agreement"), true and correct copies of which are attached hereto collectively as Exhibit 18 pursuant to which WFEF was granted a security interest in the Collateral ("WFEF Collateral").

30. WFEF's security interest in the WFEF Collateral was perfected by the filing of a UCC-1 financing statement in the California Secretary of State's Office on September 21, 2005, a true and correct copy of which is attached hereto as Exhibit 19 and incorporated herein by this reference as though set forth in full. WFEF's security interest, if any, in the Equipment, if any, was perfected by the filing of precautionary financing statements in the California Secretary of State's Office at various times between September 21, 2005 and December 12, 2007 and by the obtaining of various Certificates of Title, true and correct copies of which are attached hereto collectively as Exhibit 20 and incorporated herein by this reference as though set forth in full.

31. An Event of Default occurred under the Master Lease and Supplements to Master Lease (as that term is defined therein) because of, inter alia, the failure of the Debtor to pay to WFEF the monthly payments required to be paid thereunder on October 15, 2009 and the 15th day of each and every month thereafter, because of the failure of the Debtor to pay to the Bank the amounts required to be paid pursuant to the Secured Loan Documents, and because of the Debtor's filing the above-entitled Chapter 11 case on November 12, 2009.

**The Intercreditor Agreement**

32. On or about November 10, 2006, the Debtor, Bank, WFEF and BMA executed that certain Intercreditor Agreement, a true and correct copy of which is attached hereto as Exhibit 21 and incorporated herein by this reference as though set forth in full ("Intercreditor Agreement").

33. Secured Creditors are informed and believe and thereon allege that as more specifically alleged in Recitals B and F to the Intercreditor Agreement, BMA made various loans to

the Debtor, repayment of which is secured by various security agreements, deeds of trust and other documents encumbering the Bank Collateral and the WFEF Collateral.

34. The Intercreditor Agreement provides, in part, in Section 1 as follows:

> [S]ubject to all of the rights and powers of Bank, and WFEF pursuant to the Wells Fargo Loan Documents, the Master Lease Documents, and applicable law, [BMA] may exercise its rights and remedies under the BMA Loan Documents and applicable law. . .; <u>provided however</u>, that if the [BMA] obtains proceeds of any Personal Property Collateral upon the occurrence of default under any of the Wells Fargo Loan Documents, the Master Lease Documents, or the BMA Notes, [BMA] shall turn over to Bank and WFEF all such proceeds to be applied to Borrower's Indebtedness to Bank and WFEF until all such Indebtedness has been paid in full . . . .

35. Furthermore, Section 3 of the Intercreditor Agreement provides as follows:

> If [BMA] obtains proceeds of any Personal Property Collateral following a default under any of the Wells Fargo Loan Documents, the Master Lease Documents or the BMA Notes, then [BMA] shall turn over to Bank and WFEF all such proceeds to be applied to Borrower's Indebtedness to Bank and WFEF until all such Indebtedness has been paid in full. . . .
>
> 4. Without limiting the provisions of Section 3 above, if [BMA] collects any amounts from or related to the Personal Property Collateral while any Indebtedness of Borrower to Bank or WFEF is outstanding . . ., [BMA] shall turn over to Bank and WFEF all such amounts.

**The Debtor's Plan**

36. On March 12, 2010, the Debtor filed its Plan of Reorganization ("Plan") in the above-entitled Chapter 11 case. The Plan, on page 9, lines 19 through 25, provides as follows:

> The contractual rate of interest to BMA is 10%. BMA under the Plan shall receive interest only payments for 60 months from confirmation at the rate of 5% per annum, payable monthly. The obligation shall continue to accrue interest at the rate of 10% per annum with the accrued but unpaid interest added to the principal. Beginning on the 61st month, interest at 10% per annum should be paid monthly through month 120 at which time the entire obligation shall become due and payable.

37. The Plan further provides, <u>inter alia</u>, on pages 6, 7 and 8, that the fully secured claims of the Bank in Class 2A and 3R (collectively, the "Bank Secured Claims") shall be paid over a period of 18 months from the date of confirmation of the Plan and further provides, on

PRINTED ON RECYCLED PAPER

992984v1

- 9 -

COMPL FOR DECLARATORY RELIEF TO DETERMINE NATURE, SCOPE, EXTENT ETC.

pages 13 and 14, that that the Class 3J, 3K, 3L, 3M, 3N, 3O, 3P and 3Q secured claims of WFEF (collectively, the "WFEF Secured Claims"), shall be paid over a period of five years payable monthly beginning at the end of the first full month following confirmation of the Plan.

38. The Bank contends that pursuant to the terms of the Intercreditor Agreement, the Debtor is prohibited from paying, and BMA is prohibited from receiving, any payments on account of the BMA Class 2B and Class 3S secured claims until such time as the Bank Secured Claims and the WFEF Secured Claims are paid in full. The Bank is informed and believes thereon alleges that the Debtor and BMA dispute said contention, and contend that the Debtor is permitted to make payments to BMA and BMA is permitted to receive payments from the Debtor pursuant to the Plan notwithstanding the fact that the Bank Secured Claims and WFEF Secured Claims have not been paid in full at the time said payments are being made by the Debtor to BMA to the Plan.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief and for Extent, Priority and Scope of BMA's Liens)

39. Secured Creditors repeat and reallege the allegations contained in the paragraphs 1 through 38 above, inclusive, as though fully set forth herein.

40. Secured Creditors contend that the Intercreditor Agreement prohibits the Debtor from making payments to BMA on account of its Class 2B and Class 3S secured claims pursuant to the Plan or any amended plan of reorganization which may thereafter may be filed by the Debtor which is confirmed by this Court until such time as the Bank Secured Claims and WFEF Secured Claims are paid in full. Secured Creditors are informed and believe and thereon allege that the Debtor and BMA dispute the Bank's contention in this regard.

41. Secured Creditors seek a declaration from this Court as to the nature, scope, extent and priority of the liens held by BMA in the Bank Collateral and WFEF Collateral.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief; Determination of Enforceability of 11 U.S.C. § 510(a)

42. Secured Creditors repeat and reallege the allegations contained in paragraphs 1 through 41 above, inclusive, as though fully set forth herein.

43. The Secured Creditors contend that the provisions of 11 U.S.C. § 510(a)

prohibit the Debtor from making any payments to BMA pursuant to the Plan or any amended plan of reorganization which may thereafter be filed by the Debtor and confirmed by this Court and are informed and believe and thereon allege that the Debtor and BMA dispute the Secured Creditors' contention in this regard.

44. Secured Creditors seek a declaration from this Court that the provisions of 11 U.S.C. § 510(a) prohibit the Debtor from confirming the Plan or any amended plan of reorganization which may be filed by the Debtor and confirmed by this Court which provides for payments to made to BMA until such time as the Bank Secured Claims and the WFEF Secured Claims are paid in full.

WHEREFORE, the Bank prays for judgment as follows:

**As to the First Claim for Relief**:

1. For a declaration as to the nature, scope, extent and priority of the BMA liens, if any, in the Bank Collateral and the WFEF Collateral.

**As to the Second Claim for Relief**:

2. For a declaration that the provisions of 11 U.S.C. § 510(a) require that the terms of the Intercreditor Agreement be enforced and that the Debtor is prohibited from making any payments to BMA under its Plan or any amended plan of reorganization which may filed by the Debtor and confirmed by this Court until such time as the Bank Secured Claims and the WFEF Secured Claims are paid in full.

**As to All Claims for Relief**:

3. That the Secured Creditors be awarded their reasonable attorneys' fees and costs as to the Debtor in connection with the prosecution of this action;

4. For costs of suit incurred; and

5. For such other and further relief as this Court deems just and proper.

| | |
|---|---|
| DATED: April 28, 2010 | JEFFER, MANGELS, BUTLER & MARMARO LLP<br>ROBERT B. KAPLAN<br>WALTER W. GOULDSBURY III<br><br>By: /s/ Robert B. Kaplan<br>　　　　ROBERT B. KAPLAN<br>Attorneys for WELLS FARGO BANK, NATIONAL ASSOCIATION and WELLS FARGO EQUIPMENT FINANCE, INC. |

- 12 -　　COMPL FOR DECLARATORY RELIEF TO DETERMINE NATURE, SCOPE, EXTENT ETC.

992984v1